IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA          )
                                  )
                                  )
          v.                      )          No. 10 CR 896
                                  )
NORVELL MOORE                     )

## MEMORANDUM OPINION

Before the court is defendant Norvell Moore's motion to suppress.  For the reasons explained below we deny Moore's motion.

## BACKGROUND

On July 14, 2010, at approximately 11:30 a.m., Moore approached a woman sitting in a black BMW in a shopping center parking lot on the far north side of Chicago.  Moore, who was armed with a loaded handgun, told the woman to get out of the car.  She exited the car and ran as Moore drove off.  The victim flagged down a Chicago Police Officer, who relayed some details about the crime over the police radio.  Police Sargent Ricardo Erbacci testified at the suppression hearing that he heard over his police radio that a black BMW had been "taken at gunpoint" by a black male.  Acting on information that the car was headed towards the Kennedy Expressway, Erbacci drove his unmarked police car to the on-ramp at Foster Avenue.  When Moore drove by in the stolen car a short time later, Erbacci and other responding police officers gave chase.  Moore

drove eastbound towards downtown Chicago, weaving in and out of traffic. When he reached the Ohio Street exit ramp he made a u-turn and briefly drove westbound before stopping the car. One of the pursuing police cars drove into the left front fender of the stolen car as Moore climbed out of the driver's side window. He leapt over a short concrete barrier next to the expressway and ran off on foot. Erbacci caught up with and tackled him. Moore contends that Erbacci and the other officers who were at the scene beat him; Erbacci denies it. It is undisputed that Erbacci handcuffed Moore and asked him, "where's the gun, where's the gun," without first reading him his _Miranda_ rights. Moore told Erbacci that the gun was in the car.

Chicago Police Officer Beatovic drove Moore from the scene of his arrest to a "show-up" in the parking lot where Moore had stolen the car. In an affidavit attached to his motion, Moore states that Beatovic _Mirandized_ him "[d]uring the drive to the shopping center" and that he "did not agree to speak with any officers and did not agree to be interviewed." (Moore Aff. ¶ 3.)[1] Moore told a very different story at the suppression hearing. According to his testimony, Beatovic asked him where he got the gun and told him that he should cooperate because he could face murder charges: the victim's mother, who had been in a store at the shopping center

---

[1] Moore does not identify Beatovic by name in his affidavit, but there is evidently no dispute that Beatovic was in fact the police officer who drove Moore to the show-up.

when Moore stole the car, had a heart attack when she learned about the crime and had to be raced to the hospital. (Trans. of Hearing, dated Oct. 26, 2011, at 75.) Moore testified that he then gave Beatovic a full confession — describing how he obtained the gun and how and why he robbed the victim — because he was "hurting" and "nervous," and because "I knew that I was already caught, and there was nothing else I can do." (<u>Id.</u> at 88-90.) Beatovic did not testify at the hearing. His "Supplementary Report" indicates that Moore "voluntarily stated he wanted to help himself out" and told Beatovic that he had obtained the gun in a restaurant parking lot from an individual with the nickname, "Goat." (<u>See</u> Beatovic Supplementary Report, dated July 14, 2010, attached as Ex. 1 to Gov't.'s Resp.) There is nothing in the report about the actual carjacking. Although it is not explicit in the report itself, the government contends that Moore asked Beatovic, "what can I do to help myself?," and Beatovic responded: "tell us about the gun." (<u>See</u> Gov't.'s Supp. Resp. at 1-2.) Moore's testimony and Beatovic's report are consistent in one respect: Beatovic recited the <u>Miranda</u> warnings only after Moore made his statement. (<u>See</u> Beatovic Supplementary Report (stating that he <u>Mirandized</u> Moore after Moore told him about the gun); <u>see also</u> Trans. of Hearing, dated Oct. 26, 2011, at 76 (Moore testifying that Beatovic <u>Mirandized</u> him after he gave a full confession).)

After the victim identified Moore as the carjacker, Beatovic drove him to the police station where Officer Wendy Weller questioned him at approximately 12:35 p.m. Weller testified that before speaking with Moore she learned at least some of the details of Beatovic's conversation with him. (Trans. of Hearing, dated Oct. 26, 2011, at 41-44 (testifying that Beatovic told her about "Goat," the person Moore had identified as the source of the gun).) She then _Mirandized_ Moore, who stated that he understood his rights and agreed to speak with her. (_Id._ at 38.) He told Weller essentially what he told Beatovic about how he had obtained the gun, but went on to discuss the carjacking itself in some detail. (_Id._ at 40; _see also_ Weller Supplementary Report, attached as Ex. 2 to Govt.'s Resp.) According to the government, around 5:00 p.m. that same day Moore spoke with Detectives Tanaka and Broderick. Broderick testified that he _Mirandized_ Moore — as indicated by an asterisk he placed beside his name in his handwritten notes — and took a statement from him, essentially repeating what Moore had told Weller. (_See_ Trans. of Hearing, dated Oct. 26, 2011, at 49; "General Progress Report," dated July 14, 2010, attached as Ex. 5 to Govt.'s Resp.) According to Broderick, he contacted Assistant State's Attorney Suzanne Sanders after he interviewed Moore. Sanders spoke with Tanaka and Broderick when she arrived, although it is unclear exactly what she learned about Moore's earlier statements. Sanders testified that she also _Mirandized_ Moore and

that he agreed to speak with her. After speaking with him, she prepared a five-page, typewritten confession that contains the Miranda warnings on the first page. (See Govt.'s Hearing Ex. 1 (Statement of Norvell Moore, dated July 14, 2010).) Moore reviewed the statement, made minor changes, and signed each page at some point after 8:00 p.m.

Moore testified that Weller did not Mirandize him, and that he never spoke directly with Broderick or Tanaka about the crime. He did speak with Sanders, but he contends that she did not Mirandize him before taking his statement. Instead, she only apprised him of his Miranda rights when she handed him the typewritten confession and he read them on the first page. Moore insists that he signed it only because Sanders told him that he would not receive medical treatment until he did so. He also contends that he only explicitly agreed with the portions of his statement reciting the Miranda warnings and stating that he was "not under the influence of drugs or alcohol." (See Stmt. of Norvell Moore at 1, 5; see also Trans. of Hearing, dated Oct. 26, 2011, at 98-99.)

## DISCUSSION

### A. Legal Standard

The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court crafted the now-familiar Miranda warnings to protect the

accused's Fifth Amendment right from coercive police tactics.  <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 444-45 (1966).  With a notable exception that we will discuss in a moment, we must suppress any statement made by an accused in response to a pre-warning custodial interrogation.  <u>Id.</u>  "The government bears the burden of demonstrating the admissibility of a confession." <u>United States v.</u> <u>Stewart</u>, 536 F.3d 714, 719 (7th Cir. 2008) ("<u>Stewart II</u>").  "This requires the government to prove by a preponderance of the evidence the defendant's <u>Miranda</u> waiver and the voluntariness of the confession." <u>Id.</u>

B.   **Moore's Statement to Erbacci About the Gun's Location**

The government argues that Moore's un-warned statement to Erbacci about the gun's location falls within the public-safety exception to <u>Miranda</u>.  <u>See</u> <u>New York v. Quarles</u>, 467 U.S. 649, 655-56 (1984).  In <u>Quarles</u>, a woman told police officers that she had been raped by a man armed with a gun and that she saw her attacker enter a nearby supermarket.  <u>Id.</u> at 651-52.  The police officers went to the supermarket and spotted an individual (Quarles) matching the description that the victim had provided.  <u>Id.</u> at 652. Quarles saw the police officers and ran to the back of the store. <u>Id.</u>  The police officers chased him, briefly losing sight of him before catching up and detaining him.  <u>Id.</u>  The first police officer to reach Quarles frisked him and discovered that he was wearing an empty shoulder holster.  <u>Id.</u>  After handcuffing him, the

officer asked Quarles where the gun was and he told the officer that "the gun is over there," gesturing to some empty cartons nearby. Id. After retrieving the gun, the officer formally arrested Quarles and read him his Miranda rights. Id. Quarles agreed to answer questions without an attorney present and told the officer, in response to his questions, where he had purchased the gun. Id. In Quarles' prosecution for criminal gun possession, the trial judge suppressed his unwarned statement — "the gun is over there" — and his "tainted" post-warning statements about the gun. Id. The Supreme Court reversed, recognizing a "'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence . . . ." Id. at 655. A concealed gun in a public location poses obvious risks to the public. Id. at 657. "[T]he need for answers to questions in [such situations] outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. This exception "does not depend upon the motivation of the individual officers involved." Id. at 656. So, it was irrelevant that the arresting officer in Quarles may have had something else in mind besides the public's safety — e.g., "the desire to obtain incriminating evidence from the suspect" — when he posed the question about the gun. Id.

Moore's response to Erbacci's question at the scene of his initial arrest clearly falls within the public-safety exception to

Miranda. Erbacci credibly testified that he heard over his police radio that the carjacker had used a gun to commit the crime. Moore attempted to undermine Erbacci's testimony by pointing out that the first entry in the "Event Query" — which evidently summarizes police-radio traffic regarding the incident — does not mention a gun. (See Event Query, Def.'s Hearing Ex. 2, at 1 ("14-JUL-2010 11:42:52:" "Type: ROBB, M/B BACKPACK BLK BMW SPARTIN.").) However, the audio recording of the 9-11 calls that morning supports Erbacci's testimony. (See 9-11 Audio Recording, Govt.'s Resp. Ex. 7 (11:42 a.m.: "613 emergency, armed robbery, black BMW, license plate 'spartan;'" 11:43 a.m.: "he's armed with a handgun," "be advised, use caution, he's armed.").)[2] Moore led police on a dangerous chase through busy afternoon traffic before abandoning the stolen car and taking off on foot in an area that included residential buildings. Moore might have ditched the gun anywhere along the route between the shopping center where he robbed the victim and downtown Chicago. We conclude that Erbacci's question was "reasonably prompted by a concern for the public safety." Quarles, 467 U.S. at 656. Moore argued at the hearing that Erbacci fabricated the public-safety rationale after the fact, and that Moore posed no real danger once he was handcuffed. (See Summary of

---

[2] The fact that Moore was armed was also mentioned in police-radio transmissions during the chase. (See Video Recording, Govt.'s Ex. 6 (video of the chase in which the dispatcher is heard to say, "once again, use caution, the suspect is armed"); see also Event Query at 14 ("[J]ul-14-10 / 11:47:03 . . . m/b 28-30yo blu/whi stripe shirt carjack a female was armed with a gun taken was vict blk bmw lic spartan nfi").)

Event, Def.'s Ex. 1, dated Oct. 17, 2011 (summary of the government's post-indictment interview with Erbacci in which he stated that "he asked MOORE where the gun was for the purpose of officer safety").) The Supreme Court explicitly held on similar facts that the arresting officer's subjective motivations are irrelevant. *See* <u>Quarles</u>, 467 U.S. at 652, 655 (noting that the police officer asked about the gun's location only after handcuffing the defendant and that "there was nothing to suggest that any of the officers were any longer concerned for their own safety"). We conclude that Moore's statement about the gun's location is admissible and does not taint his later confessions. *See* <u>id.</u> at 660.

**C. The Admissibility of Moore's Subsequent Confessions**

If we accept Moore's version of his interaction with Beatovic on the way to the show-up — at least the version he presented during the suppression hearing — then he would have a stronger case for suppressing the confessions he later made at the police station. However, we do not find Moore's story credible. As we said before, Moore states in his affidavit that he did not say anything to the police officer who transported him after his initial arrest. And his brief in support of the motion is premised entirely on his statement to Erbacci and his subsequent confession to Sanders, approximately eight hours later. (*See* Moore's Mem. at 6-7.) It is implausible that Moore would have neglected to mention in his affidavit that Beatovic had trumped up the case against him

with a phony story about the victim's mother having a heart attack.
And if he had given a full confession to Beatovic under the
mistaken impression that he was facing murder charges, it is
implausible that Beatovic would omit the details of the crime from
his report. It is unfortunate that the government did not call
Beatovic as a witness,[3] but we conclude that its version of events
is credible. Beatovic's conversation with Moore, as described in
his report, is consistent with Moore's interactions with the other
law enforcement officers that day:

> While transporting, the subject voluntarily stated he
> wanted to help himself out and told R/O that he got the
> gun from a M/1/28, known as GOAT, 'Greatest of All Time.'
> This occurred at 95th & Halsted, in the McDonalds parking
> lot on 13 Jul 10. At 1221 hrs the subject was positively
> I.D. by the victim. R/O arrested & Mirandized per #158
> of FOP Book.

(Beatovic Supplemental Report; see also Trans. of Hearing, dated
Oct. 26, 2011, at 96-97 (Moore testifying that he wanted to
cooperate and that his statements to Erbacci, Weller, and Sanders
were "voluntary").) Moore was a convicted felon on parole and he
wanted to cooperate with law enforcement because cooperation was
his best chance for leniency. It is likely that Beatovic prompted
Moore's statement about the gun, as the government has stipulated.
But we do not believe Moore's testimony that he was tricked into
giving a full confession before he was Mirandized.

---

[3] The government represented that Beatovic was unavailable to testify on
the dates scheduled for the hearing.

The government argues that Moore's pre-warning statement to Beatovic, which it says it will not seek to admit at trial, does not taint his later confessions. (Govt.'s Supp. Resp. at 2.) The law in this area is unsettled. Under _Oregon v. Elstad_, 470 U.S. 298, 317-18 (1985), if Moore's pre- and post-warning statements were voluntary, then the post-warning statements are admissible and there is no need to consider whether they may have been "tainted" because the _Miranda_ warnings were not issued earlier. _See also United States v. Stewart_, 388 F.3d 1079, 1087-88 (7th Cir. 2004) ("_Stewart I_"). If the pre-warning statement was coerced, then "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over to the second confession." _Stewart I_, 388 F.3d at 1088 (citing _Elstad_, 470 U.S. at 310). The Supreme Court modified the rule announced in _Elstad_ in _Missouri v. Seibert_, 542 U.S. 600 (2004). In that case, a police officer elicited a pre-warning confession from the defendant after intensive interrogation. _Id._ at 604-05. He then read her the _Miranda_ warnings, obtained her signed waiver, and had her confirm what she had already confessed. _Id._ at 605. The interrogating police officer candidly admitted that his "question-first" strategy was deliberate and that he had been trained to conduct interrogations in this fashion. _Id._ at 605-06. A majority of the Justices concluded that the lower court correctly suppressed the defendant's pre- and post-warning confessions, but no single

rationale garnered majority support. Four Justices concluded that in cases involving two-step interrogations the post-warning confession is admissible only if the _Miranda_ warning was "effective," which in turn depends on factors such as: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." _Id._ at 615. Justice Kennedy, concurring in the judgment only, would consider such factors only if law enforcement officers deliberately employ a question-first strategy to circumvent _Miranda_. _Id._ at 622; _cf._ _id._ at 615 n.6 (plurality op.) ("Because the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work."); _id._ at 623 (dissenting op.) ("[T]he plurality correctly declines to focus its analysis on the subjective intent of the interrogating officer."). Justice Breyer wrote separately to say that he favored a rule excluding "the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." _Id._ at 617; _cf._ _id._ at 613 n.4 (plurality op.) (explicitly rejecting the "fruit of the poisonous tree" approach); _id._ at 623 (dissenting op.) (same). The three dissenting Justices would have admitted defendant's post-

warning statement applying the principles announced in Elstad. Id.
at 628 (dissenting op.).

In Stewart I our Court of Appeals "tentatively" concluded that
Elstad's voluntariness test survived Seibert "at least as to
deliberate two-step interrogations in which Miranda warnings are
intentionally withheld until after the suspect confesses." Stewart
I, 388 F.3d at 1090; see also United States v. Heron, 564 F.3d 879,
885 (7th Cir. 2009) (characterizing Stewart I's interpretation of
Seibert as "tentative").  We conclude, first, that the government
satisfied its burden to show that the police "did not deliberately
withhold warnings until after they had an initial inculpatory
statement in hand." Stewart II, 536 F.3d at 719.  Unlike Seibert,
there is no direct evidence that the police used a deliberate two-
step interrogation strategy.  Cf. Seibert, 542 U.S. at 605-06.  And
it would be a stretch to infer such a strategy from the facts of
this case.  As far as Moore's own guilt was concerned, his pre-
warning statement to Beatovic added little to what the police
already knew or could surmise from other evidence.[4]  Weller (not
Beatovic) interrogated Moore at the police station, and we believe
her testimony that she Mirandized Moore.  It was only at that point
— after receiving the Miranda warnings from two separate officers
in two different locations — that Moore was asked about the

_____

[4] The police could infer from Moore's statement to Erbacci about the gun's
location that the gun was his.  And even if he had not told Erbacci where it was,
the police would have made the connection when they searched the car: the victim
reported being carjacked at gun point in broad daylight, Moore led the police on
a high-speed chase in her car, and there was a gun in the car.

carjacking itself.   See Stewart II, 536 F.3d at 722 (concluding
that the lack of overlap in questioning supported a finding that
the failure to administer Miranda warnings is not deliberate).
These  facts  are  more  consistent  with  a  "good  faith  Miranda
mistake,"  Seibert,  542  U.S.  at  615  (plurality  op.),  than  a
deliberate attempt to undermine the warnings.   Applying Stewart I,
the admissibility of Moore's statements at the police station is
governed by Elstad, not Seibert.   See Stewart I, 388 F.3d at 1090.

     The first question under Elstad is whether Moore's pre-warning
statement to Beatovic was voluntary.   "The voluntariness inquiry
asks whether the confession is 'the product of a rational intellect
and free will and not the result of physical abuse, psychological
intimidation, or deceptive interrogation tactics that have overcome
the defendant's free will.'"   Stewart II, 536 F.3d at 723 (quoting
United States v. Gillaum, 372 F.3d 848, 856 (7th Cir. 2004)).   In
Stewart II, the Court concluded that the defendant's affirmative
response to the pre-warning question — did you commit the robbery?
— was voluntary.   Id. at 717.   We see little if any difference
between that question and "tell us about the gun," or words to that
effect.   Moore testified that he was "nervous," but that does not
make Beatovic's statement coercive.   See id. at 723 (concluding
that the defendant's "emotional reaction" to the appearance of two
FBI  agents  in  the  interrogation  room  was  "hardly  evidence  of
coercive interrogation tactics").   Moore also testified that he was
"hurting"  at  the  time,  which  we  understand  to  refer  to  his

contention that Erbacci and other officers beat him shortly after he was detained. Erbacci testified that Moore was not beaten, and Sanders testified that (contrary to Moore's testimony) he did not request medical attention during her interview with him. Erbacci and Sanders struck us as credible witnesses, whereas we have serious reservations about Moore's truthfulness. On the other hand, the government apparently does not dispute Moore's contention that he was taken to the hospital at some point after he spoke with Sanders. But even if the police did use excessive force during the initial arrest, we still conclude that Moore's statement to Beatovic was voluntary. This was not Moore's first brush with the criminal justice system, and he was acutely aware of his predicament: a convicted felon on parole with a gun in a stolen car. (Trans. of Hearing, dated Oct. 26, 2011, at 86); see also Watson v. DeTella, 122 F.3d 450, 453 (7th Cir. 1997) (the court considers the defendant's experience with the criminal justice system, among other factors, in evaluating whether his confession was voluntary). He wanted to cooperate once he realized that he could not escape. (Trans. of Hearing, dated Oct. 26, 2011, at 89.) Because we conclude that Moore's statement to Beatovic was voluntary, his post-warning statements are admissible if they, too, were voluntary. Moore admitted that they were. (Id. at 96-97.)

Even if the Seibert plurality's test applies, we still conclude that Moore's warned statements are admissible. See Heron, 564 F.3d at 885-86 (analyzing the defendant's motion under both

Justice Kennedy's and the plurality's approaches). The time that elapsed between Moore's statement to Beatovic and his initial interrogation at the police station — less than an hour, by our estimate — was not significant. Cf. Seibert, 542 U.S. at 605 (only a 20-minute break after 30-40 minutes of intensive interrogation). But the location, the interrogator, and the subjects of interrogation had changed. See Heron, 564 F.3d at 886 (We must examine each factor "for the light it throws on the central inquiry: whether the later Miranda warnings were effective."). Moore did not proceed directly from the scene of his initial arrest to the police station for further interrogation. Beatovic took him first to the shopping center, where the victim identified Moore as the carjacker and Moore received the Miranda warnings for the first time. The trip to the shopping center for the show-up between the two interrogations is a significant "break in the stream of events," (Elstad, 470 U.S. at 310), even if the entire sequence did not take much time. Beatovic then drove Moore to the police station, where Weller Mirandized him again. Weller testified that Beatovic was in the room when she questioned Moore, and as we previously indicated, the questioning did overlap to a degree. (See Trans. of Hearing, dated Oct. 26, 2011, at 42.) But we think it would have been clear to Moore that he could stop answering the officers' questions. At that point he had only disclosed where and from whom he had obtained the gun. Cf. Seibert, 542 U.S. at 616 ("When the police were finished there was little, if anything, of

incriminating potential left unsaid."). We do not believe that Moore was confused about his rights. Cf. id. at 616-17. He did not want to remain silent for the reasons we have already discussed. We conclude that the Miranda warnings that Moore received before his full confession to Weller were effective and his statement to her is admissible. It follows that his later confessions, addressing essentially the same subject matter, are also admissible.[5]

## CONCLUSION

Moore's motion to suppress (47, 49) is denied. A status hearing is set for November 30, 2011 at 9:30 a.m.


DATE:       November 18, 2011


ENTER:      _____
            John F. Grady, United States District Judge

---

[5] Moore contends that Sanders did not Mirandize him until after she took his statement. By our count, Moore had received the Miranda warnings three times before he even met with Sanders. And for good measure, we find that Sanders did recite the Miranda warnings before taking his statement. She credibly testified that it was her practice to read the Miranda warnings before taking a suspect's statement, and it is implausible that she would deviate from that practice under these circumstances. She had nothing to gain by doing so. It was unnecessary, however, for the officers to continually remind Moore of his rights. See United States v. Edwards, 581 F.3d 604, 606-07 (7th Cir. 2009).